*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LOREN TROUEZE ROBINSON,

        Defendant-Appellant.

UNPUBLISHED
February 25, 2021

No. 349826
Berrien Circuit Court
LC No. 2010-001540-FH

Before: BECKERING, P.J., and SAWYER and SHAPIRO, JJ.

PER CURIAM.

This case returns to this Court a second time, following defendant's resentencing. After jury convictions for extortion, MCL 750.213; delivery of less than 50 grams of cocaine, MCL 333.7401, MCL 333.7413; unlawful imprisonment, MCL 750.349b; and aggravated assault, MCL 750.81a, the Berrien County circuit court sentenced defendant, Loren Troueze Robinson, as a habitual second offender, MCL 769.10, to concurrent prison terms of 150 to 360 months for the extortion conviction, 38 to 480 months for the delivery of a controlled substance conviction, 120 to 270 months for the false imprisonment conviction, and 365 days for the aggravated assault conviction. After this Court affirmed defendant's convictions and sentences on defendant's first appeal,[1] and the Michigan Supreme Court denied his application for leave to appeal,[2] defendant petitioned for a writ of habeas corpus in the Western District of Michigan. The case eventually made its way to the Sixth Circuit Court of Appeals, which conditionally granted defendant's petition with respect to his sentencing issues, and "remanded the case to the district court with instructions to remand to the state sentencing court for sentencing proceedings" consistent with the Sixth Circuit's opinion. *Robinson v Woods*, 901 F3d 710, 718 (CA 6, 2018). On remand from the federal district court, the trial court resentenced defendant to the same sentence originally

---

[1] *People v Robinson*, unpublished per curiam opinion of the Court of Appeals, issued July 20, 2013 (Docket No. 303236).

[2] *People v Robinson*, 495 Mich 915 (2013).

imposed. Defendant now appeals by right, raising several sentencing issues. Finding no error, we affirm.

## I. PERTINENT FACTS AND PROCEEDINGS

The charges against defendant arose from efforts to collect a drug debt from the victim, Joshua Karamalegos. According to testimony presented at defendant's trial, on March 6, 2010, Joshua's acquaintance, Marcus Hughes, and two other men picked Joshua up in Niles and drove him to Benton Harbor. They stopped along the way at an ATM so Joshua could use his debit card to withdraw $200, and then proceeded to a drug house on Lavette Street. Joshua gave defendant the $200 in exchange for crack cocaine, which Joshua and Marcus smoked in a back room of the house. Whenever Joshua ran out of crack cocaine, defendant "fronted" him more until, by defendant's estimate, Joshua had run up a $1,000 debt. Around midnight, as Joshua, defendant, and some other men were returning to the drug house after having driven to Marcus's house, they stopped at a gas station so defendant could make sure that Joshua had "available funds" on his debit card. Defendant used Joshua's debit card to buy cigarettes and food items.

On Sunday, March 7, 2010, around 6:00 or 7:00 a.m., defendant began to inquire how he was going to get his $1,000 from Joshua. Joshua told defendant that he needed to go back to Niles to get the money, but defendant was not comfortable letting Joshua out of his sight. Defendant indicated that if Joshua bought him a $500 television, he would call it "even." Defendant, co-defendant Vincent Wiggins, and Joshua went into a store and defendant picked out a television. But when Joshua tried to buy the television with his debit card, the card was declined. After the men returned to the house on Lavette, defendant telephoned Joshua's bank and learned there was no money on Joshua's debit card. According to Joshua, defendant became upset.

When defendant, Wiggins, and Joshua returned to the house on Lavette Street, they went into the back room. Defendant sat on a couch that had been pushed against the door, and Wiggins stood in front of Joshua, who was sitting on a dresser. Joshua became insistent that he be allowed to leave, telling them he could not get any money until he went back to Niles. Joshua testified that he became upset and started yelling, and that Wiggins put on a pair of gloves and hit him multiple times, each punch causing Joshua to black out. Joshua said he became hysterical. He told the people in the room that he had suffered a closed head injury in a car accident in 2005, and that if he got hit hard enough in the head, he could have a seizure and die. Joshua did not recall defendant saying anything to Wiggins, but remembered defendant sitting on the couch, blocking anybody from getting in or out of the room while, according to Joshua, letting his friends do the "dirty work."

At some point, the men took Joshua's cell phone, wallet, and glasses. Defendant told Joshua he was not leaving the house until he paid his debt, and suggested Joshua call his father or somebody to get the money. Eventually, Joshua gave defendant a telephone number for Tim, Joshua's father, and defendant used his own cell phone to call Tim. Defendant put his cell phone on "speaker phone" and let Joshua talk with Tim. At first, Tim did not take Joshua seriously; the record suggests that Joshua made multiple calls to his father over several hours. At one point, defendant, Wiggins, and Victor Sawyer, who had been the driver that weekend, escorted Joshua from the drug house to a car, and Sawyer drove them to a nearby abandoned house owned by defendant's father. Joshua continued to use defendant's cell phone to plead with his father to pay

the $1,000. When Joshua became increasingly hysterical and said, as he had been instructed to say, that Tim would not see him anymore if he did not get the $1,000, Tim began to take the matter seriously.

Joshua testified that, after Tim agreed to provide the money, defendant, Wiggins, and Sawyer "really started collaborating" and trying to figure out a place to exchange Joshua for the money. The three men eventually decided that the exchange would take place at an apartment complex. They left the abandoned house, and Sawyer drove them to the location, where they waited in the parking lot for Tim. Wiggins then drove Joshua across the street to "make the transaction," and then returned to the apartment complex and gave defendant the $1,000.

As already indicated, defendant was tried, convicted, and sentenced in the Berrien County circuit court. In accord with the federal district court's order, the matter returned to the circuit court for resentencing, which occurred in June 2019. After hearing oral argument and defendant's address to the court, the court imposed the same sentence as at the initial sentencing. Defendant appealed in this Court, and while his appeal was pending, successfully moved for remand to the trial court so he could file a motion for another resentencing.[3] After hearing oral arguments, the trial court denied the motion. Subsequently, both parties filed supplemental briefs in this Court.

## II. SCORING ERRORS

Defendant first argues that the trial court erred in assessing points for OV 7 (aggravated physical abuse) and OV 8 (asportation). We find no error.

## A. STANDARD OF REVIEW

This Court reviews de novo a trial court's interpretation of the sentencing guidelines. *People v Huston*, 489 Mich 451, 457; 802 NW2d 261 (2011).

> Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo. [*People v Hardy*, 494 Mich 430, 438; 835 NW2d 340, 344 (2013).]

Evidence upon which a trial court may rely in scoring the sentencing guidelines includes the trial testimony and the contents of the presentence investigation report (PSIR). *People v Althoff*, 280 Mich App 524, 541; 760 NW2d 764 (2008).

---

[3] *People v Robinson*, unpublished order of the Court of Appeals, entered January 22, 2020 (Docket No. 349826).

## B. OV 7

Offense variable 7 addresses aggravated physical abuse. MCL 777.37(1). At the time of defendant's original sentencing, MCL 777.37(1) required an assessment of 50 points if a victim was "treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense."[4] The trial court assessed 50 points for OV 7 on the basis of "conduct designed to substantially increase the fear and anxiety of a victim." At the time, "conduct designed to substantially increase the fear and anxiety of a victim" did not have to be similarly egregious to sadism, torture, or excessive brutality for OV 7 to be scored at 50 points. *Hardy*, 494 Mich at 433. The relevant inquiries were (1) whether the offender engaged in conduct beyond the minimum required to commit the offense, and if so, (2) whether the conduct was intended to make a victim's fear or anxiety greater by a considerable amount. *Id.* at 443-444. To resolve these questions,

> a court must first determine a baseline for the amount of fear and anxiety experienced by a victim of the type of crime or crimes at issue. To make this determination, a court should consider the severity of the crime, the elements of the offense, and the different ways in which those elements can be satisfied. Then the court should determine, to the extent practicable, the fear or anxiety associated with the minimum conduct necessary to commit the offense. Finally, the court should closely examine the pertinent record evidence, including how the crime was actually committed by the defendant. [*Id*. at 442-443.]

The trial court identified the following as factoring into its scoring decision: (1) the jury convicted defendant of aggravated assault; (2) Joshua was held for a significant period of time; (3) Joshua gave defendant his father's phone number, and defendant called the father; (4) defendant and Wiggins moved Joshua from the house on Lavette to an abandoned house; (5) the perpetrators took Joshua's cell phone, wallet, and glasses, leaving him unable to see; (6) defendant told Joshua he was not leaving until defendant had his money; and (7) Joshua was brutally beaten, although not by defendant. The court then concluded that the events of the "extortion continuum" exceeded the minimum required to commit extortion and "dramatically increase[d] the anxiety and fear of [Joshua] that he was not going to go home . . . until that money arrived." The court acknowledged that defendant did not administer the blows that knocked Joshua unconscious and resulted in a concussion, but defendant "was present and it was his money they wanted."

Defendant does not dispute the trial court's factual findings, its conclusion that Joshua suffered treatment in excess of what was required for extortion, or that the treatment Joshua suffered was "designed to make [his] fear or anxiety greater by a considerable amount." *Hardy*, 494 Mich at 444. The dispositive question here is whether the trial court's findings with respect

---

[4] 2015 PA 137, effective January 5, 2016, amended MCL 777.37(1) by inserting "similarly egregious" before the word "conduct" in subsections (a) and (b). Defendant does not dispute that the language quoted above applies to defendant because he committed the sentencing offenses prior to January 5, 2016.

to *defendant's* conduct are legally sufficient to support a score of 50 points for OV 7. Relying on *People v Hunt*, 290 Mich App 317; 810 NW2d 588 (2010), defendant contends they are not.

This Court held in *Hunt* that a trial court must score OV 7 on the basis of the defendant's conduct, not that of his codefendants. *Hunt*, 290 Mich App at 326 ("For OV 7, only the defendant's actual participation should be scored."). *Hunt* involved a defendant convicted of kidnapping, felony-firearm, and two counts of felonious assault for his part in efforts he and two co-defendants undertook to recover a co-defendant's stolen car. The victims were kidnapped at gunpoint, taken to various locations, threatened, roughly handled, and tied up, and one of the victims suffered a prolonged beating. *Id*. at 319-323. Although the defendant possessed a handgun, participated in kidnapping the victims, and rode in the vehicles used to move them from place to place, no evidence indicated that he was involved in threatening, beating, or tying up the victims. Nevertheless, "[t]he trial court assessed 50 points for OV 7 because (1) the victims were moved from location to location, (2) a substantial beating was inflicted, designed to increase fear, and (3) one of the victims was beaten by multiple individuals." *Id*. at 323.

On appeal, the defendant argued that the trial court erred in assessing 50 points for OV 7 because his participation was minimal; of the three factors upon which the trial court based its score, only the first applied to him. *Id*. at 323-324. This Court agreed. The evidence "was conflicting with regard to whether defendant ever pointed a weapon at one of the victims," the record showed that the defendant did not participate in tying up or beating any victims, and "there was no testimony that defendant ever encouraged [his co-defendants or the man who beat the victims] in any of their behaviors." *Id*. at 324. The Court concluded that, under these circumstances, testimony from one of the victims that the defendant pointed his weapon at her during the kidnapping "was not sufficient to demonstrate acts that qualify as 'sadism, torture, or excessive brutality' under OV 7." *Id*.

The present defendant's leadership role in the extortion plan, his financial interest in the success of the plan, and his level of engagement at every stage of the plan distinguish this case from *Hunt*. Joshua testified that defendant, Wiggins, and Sawyer "collaborate[d]" more than once about how to get defendant's money back, and both Joshua and Sawyer testified that defendant was "in charge." Nothing in *Hunt* indicates that the defendant was involved in any decision-making processes, and certainly not that he was "in charge." In the instant case, defendant had a financial interest in recovering money for the drugs he had "fronted" to Joshua, but the defendant in *Hunt* had no such interest in recovering his co-defendant's car. Further, defendant was present and engaged at every stage of the extortion in a way the defendant in *Hunt* was not. Defendant ensured Joshua had "available funds" on his debit card; kept Joshua supplied with cocaine; initiated the conversation about repayment; discussed that Joshua could settle the debt by buying him a television; went inside Walmart with Joshua to purchase a television; called Joshua's bank to find out whether there was money on his debit card; was present in the room—sitting on a couch pushed against one of the doors, blocking anybody from getting in or out of that door—while Wiggins was punching Joshua, causing him to black out; called Joshua's father in an effort to get the money; moved Joshua to the abandoned house; arranged to exchange Joshua for the $1,000; went to the exchange location; and received the money once the exchange was made. Put simply, the defendant in *Hunt* was one of several henchmen, a "minion," who was accountable under OV 7 only for his own actions, whereas the evidence in this case shows that defendant was the ringleader of the debt collection efforts, and that others were acting on his behalf and at his behest.

Nevertheless, defendant argues that nothing *he* did constituted sadism, torture, or excessive brutality. It is true that no one testified they heard defendant instruct Wiggins to beat Joshua. Nor is there evidence establishing who took Joshua's cell phone, wallet, and glasses. But the record leaves no doubt that defendant knew about, encouraged, and approved of the treatment Joshua suffered, and that defendant "engaged in conduct beyond the minimum required to commit [extortion]." *Hardy*, 494 Mich at 433. Extortion occurs when "a defendant maliciously threatens to injure another person with the intent to compel that person to do any act against his will, without regard to the significance or seriousness of the compelled act." *People v Harris*, 495 Mich 120, 123; 845 NW2d 477(2014); MCL 750.213. Here, not only was Joshua threatened with injury if he did not pay his debt to defendant, but the jury found that he was assaulted, kidnapped, and unlawfully imprisoned in the effort to collect that debt. As already indicated, multiple witnesses testified that defendant was "in charge" of the extortion efforts that unfolded. Joshua testified that defendant, Wiggins, and Sawyer, were working together, and that defendant was in the room, blocking an exit, while Wiggins beat him in an effort to procure money for defendant. Added to this is evidence of all the ways identified above that defendant was engaged in what the court called the "extortion continuum," including telling Joshua he was not leaving the drug house until defendant got his money, which compels us to conclude that even if defendant did not personally strike Joshua, his conduct went beyond what was necessary to commit extortion. Thus, the first prong of the *Hardy* test is satisfied. *Hardy*, 494 Mich at 443-444.

As to the second prong, the purpose of defendant's actions may have been to force Joshua to comply with his demands for repayment. However, it forced his compliance by increasing his fear and anxiety, making him think at some point (e.g., during the beatings) that he might actually die. See *Hardy*, 494 Mich at 444 (observing that racking a shotgun at a driver during a carjacking "only urges compliance if doing so makes the victim fear imminent, violent death if he or she does not comply"). There is no evidence that Joshua feared "imminent, violent death," but, he testified that he became hysterical, was yelling, and he told them that because of a prior closed head injury in 2005, if he was hit hard enough he could have a seizure and die. Observing Wiggins beat Joshua to the point of causing blackouts and a concussion, moving Joshua to a location where he was isolated with the people who had threatened and beaten him, further isolating him and rendering him vulnerable by not allowing him to have his glasses and cell phone, telling Joshua he could not leave until he paid what was owned, and making good on that threat by not letting Joshua out of his sight, are actions reasonably "intended to make a victim's fear or anxiety greater by a considerable amount." *Id.* at 443-444. Thus, the second prong of the *Hardy* test is met.

Based on all of the evidence, including circumstantial evidence, we conclude that a preponderance of that evidence supports the trial court's finding that defendant engaged in "conduct designed to substantially increase the fear and anxiety a victim suffered during the offense," warranting a score of 50 points for OV 7 for MCL 777.37(1)(b).

C. OV 8

OV 8 addresses "victim asportation or captivity." MCL 777.38(1). A trial court properly assesses 15 points if "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." MCL 777.38(1)(a). The trial court assessed 15 points for OV 8 because Joshua was placed in a car against his will, driven to an abandoned house, and prevented from leaving. These facts were

clearly established by a preponderance of the evidence. Defendant argues that the trial court erred by scoring OV 8 because the charged crimes occurred "on Lavette Street in the City of Benton Harbor," and, thus, asportation to the abandoned house was not part of the charged offenses. However, defendant fails to establish that the abandoned house was not on Lavette Street. Sawyer, who drove defendant, Wiggins, and Joshua, to the abandoned house, testified that the house was on Lavette Street, about five houses down from the drug house where everyone was smoking cocaine. Defendant does not point to any record evidence contradicting Sawyer's testimony. "[B]ecause defendant has failed to establish the factual predicate for his claim, his claim is without merit." *People v Odom*, 327 Mich App 297, 314; 933 NW2d 719 (2019).

In light of the foregoing, we find that the court's factual determinations for scoring purposes are not clearly erroneous, are supported by a preponderance of the record evidence, and "are adequate to satisfy the scoring conditions prescribed by statute satisfy the scoring criteria." *Hardy*, 494 Mich at 438.

## III. INACCURATE INFORMATION

Defendant next contends that he is entitled to resentencing because his sentence was based on inaccurate information. Defendant's argument is without merit.

This Court reviews a trial court's response to a claim of information inaccuracy for an abuse of discretion. *People v Uphaus* (*On Remand*), 278 Mich App 174, 181; 748 NW2d 899 (2008). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. See *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017). Whether defendant is entitled to resentencing is a legal question that this Court reviews de novo. *People v Francisco*, 474 Mich 82, 85; 711 NW2d 44 (2006).

Defendant's allegation of information inaccuracy arises from the trial court's recitation of defendant's criminal history during his 2019 resentencing. The court stated:

> On January 24, 2007, when you were still 17, you were arrested for maintaining a drug house. That was eventually nollied [sic] because in May of 2007, when you were 18, you were convicted of possession of marijuana.
>
> In January of 2008, you were charged with possession of marijuana, second offense, reduced to possession of marijuana first offense. You had a contempt charge of some sort that I handled.
>
> *March of 2009, you were charged with delivery of cocaine, less than 50 grams, second offense and also delivery – possession with intent to deliver marijuana second offense and fail to appear on those charges.*
>
> In the meantime, in August of 2009, you got another charge which was delivery or possession with intent to deliver marijuana second offense reduced to possession with intent to deliver first offense which is a four year felony. *And the other charges from Jan—from March were nollied [sic] and I note the same judge,*

*so my guess is that it was pursuant to your plea agreement that those would be dismissed.*

*The point here being that you had numerous drug offenses that you were involved in.  So this was not, on the date in 200 [sic] – that we are talking about, this is not an aberration, this was what you were doing. This is who you are or who you were at the time.  You were a drug dealer . . . .*

Defendant's claim of error is the trial court's supposition that his March 2009 drug charges were dismissed as part of an August/September plea agreement that resolved additional drug charges filed against him in August.  Defendant correctly points out in his main brief to this Court that the document upon which the court relied for defendant's criminal history, Public Access Defendant History Report, reported that the March 2009 charges were dismissed in May 2009. Defendant raised this claim of error on remand in his motion for another resentencing.  At the motion hearing, the trial judge responded as follows:

*And I made the wrongful supposition that because both of those charges as well as the contempt were nolled [sic] or dismissed that . . .that was on the motion of the prosecutor on – on that case.  But I did not rely upon anything regarding that as far as the sentencing was concerned.  Other than – than to list that in a litany of prior charges that the defendant had, some of which resulted in conviction, some of which did not.*

*My misstatement had to do, and I did not rely upon this case and I am just referring to, as a matter of conviction of the defendant.  Other than the fact that this was a litany of charges that he had over a period of time, and to make the point that over this extended period of time, he had numerous charges and convictions regarding being a drug dealer. And that's what this case was all about was dealing drugs and then the repercussions when the person that purchased the drugs, [Joshua], didn't pay up.  So that was my only point.*

As this quotation from the 2020 motion hearing illustrates, the trial court admitted it had misspoken but assured defendant it had not relied on its erroneous assumption when sentencing him; in other words, the error was irrelevant for sentencing purposes.  The court handled the matter analogously to how our court rules require a court to handle a challenge to inaccurate information in a PSIR.  The court heard defendant's challenge, made a finding with respect to the challenged information (the supposition was incorrect), and deemed it irrelevant (it was not relied on when sentencing defendant).  See MCR 6.425 (E)(2)(a).

In light of the foregoing, we conclude that the trial court's handling of defendant's claim of informational inaccuracy was not an abuse of discretion.  *Uphaus* (*On Remand*), 278 Mich App at 181.  Defendant continues to insist in his supplemental brief to this Court, filed after the trial court's explanation of its error, that the trial court relied on its misstatement when sentencing him. Nevertheless, defendant has failed to provide any logical explanation of how the court's misapprehension regarding the circumstances surrounding dismissal of his March 2009 drug charges could conceivably factor into the trial court's sentencing decision.  "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his

claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009). Given the trial court's reasonable handling of the matter and defendant's failure to properly present this claim of error, the court's error does not entitled defendant to resentencing. *Uphaus* (On Remand), 278 Mich App at 181.

## IV. REMAINING CLAIMS OF ERROR

Lastly, defendant contends that the trial court erred in denying his motion for another resentencing because the trial court failed to consider, or to adequately consider, defendant's rehabilitation, learning disability, remorse, and youthfulness. This Court reviews a trial court's decision on a motion for resentencing for an abuse of discretion. *People v Puckett*, 178 Mich App 224, 227; 443 NW2d 470 (1989). As already indicated, whether defendant is entitled to resentencing is a legal question this Court reviews de novo. *Francisco*, 474 Mich at 85. We address defendant's various arguments in turn.

## 1. REHABILITATION

Defendant contends that the trial court's statement at his 2019 resentencing, that it was not going to consider "any rehabilitation," entitles him to another resentencing because it was contrary to Michigan's sentencing policy, which maintains that rehabilitation can occur in prison. *People v McFarlin,* 389 Mich 557, 574; 208 NW2d 504 (1973).

When defendant raised this issue at his 2020 motion, the trial court replied, "I don't remember specifically hearing anything that, you know, he got a high school diploma, college degree, trade, or drug or alcohol rehabilitation, substance abuse, you know, anything of that nature specifically that would go towards direct rehabilitation." The trial court's observation points to the context for the challenged statement.

At defendant's 2019 resentencing, the prosecutor urged the court to factor into its resentencing decision the 35 misconduct tickets defendant had allegedly amassed during his incarceration. Most of the tickets were minor, but one resulted in a felony conviction for possession of a weapon. Defense counsel argued that it was impermissible for the court to consider defendant's prison misconduct, but offered no evidence to offset the prosecution's misconduct tickets and to show that defendant was rehabilitated. In other words, whereas the prosecution was prepared to offer evidence that defendant was not rehabilitated, defense counsel was not prepared to offer any comparable evidence "that would go toward direct rehabilitation." Viewed in context, the court's saying it would not consider "any rehabilitation," was consistent with its decision not to consider any evidence of defendant's prison conduct, favorable or unfavorable. In his supplemental appellate brief, defendant does not address the 2019 context for the challenged statement, nor does he suggest what evidence of rehabilitation would have weighed in his favor. Considering the challenged statement in context, it does not appear to us that the trial court was expressly disavowing Michigan's sentencing policy.

In addition, the court stated at the 2020 motion hearing that it recalled defendant's attorneys at the 2019 resentencing talk about defendant's disposition "and etcetera etcetera." The 2019 resentencing transcript shows that defendant's attorneys described defendant's agreeable disposition, his community support, and the lessons he had learned during incarceration. All of

this either suggested or demonstrated defendant's potential for rehabilitation. The court's 2020 comment suggests that the court listened to the arguments of defendant's attorneys at the 2019 resentencing, even if the court could not remember them precisely. That the court did not comment during resentencing on all of the factors presented in favor of defendant's rehabilitation does not mean the court did not consider them. See *People v Nunez*, 242 Mich App 610, 618; 619 NW2d 550 (2000) (stating that the court's failure to comment on all mitigating factors the defendant mentioned does not mean that it did not consider them).

In light of the foregoing, and when viewed in context, we are not persuaded that defendant is entitled to another resentencing based solely on the court's statement at the 2019 resentencing regarding rehabilitation.

## 2. LEARNING DISABILITY

Defendant next contends he is entitled to resentencing because the court did not adequately consider his learning disability. At the 2019 resentencing, defendant's attorney explained that a learning disability made it difficult for defendant to make good, quick, well-reasoned decisions in difficult situations. Addressing this issue in its ruling on defendant's 2020 motion for another resentencing, the court recalled that the charged crimes occurred over an extended period, and noted that defendant had not acted irrationally, rashly, or impulsively, but had proceeded in a calculated manner to collect Joshua's debt. The court concluded that even if defendant had a learning disability with the effects his attorney described, there was no record evidence that it affected the conduct at issue.

Defendant does not dispute the trial court's conclusion, nor does he provide any binding authority supporting his position that a disability that does not bear on culpability is nevertheless a mitigating factor for purposes of sentencing. Under the circumstances, defendant is not entitled to resentencing.

## 3. REMORSE

Defendant also contends he is entitled to resentencing because he has shown "a great deal of remorse." Defendant raised this issue at the 2020 hearing on his motion for another resentencing. The trial court replied:

> [T]he remorse at [the 2019] resentencing, saying you're sorry and apologizing is – is not, per se, indicative of a rehabilitation. Particularly nine years later. But again, the Court heard counsel, heard the defendant, considered all those factors, but also looked at what occurred on that particular occasion, looking at defendant's record and did not – did not change the sentence, the original sentence.

Thus, the court indicated that it had, in fact, listened to and considered defendant's statement of remorse and his attorneys' arguments regarding his remorsefulness at the 2019 resentencing. The court then weighed those factors against defendant's criminal history and his conduct during the charged crimes, both of which are valid factors to consider for sentencing purposes. See *People v Hunter*, 176 Mich App 319, 320-21; 439 NW2d 334 (1989) (noting that the discipline of the wrongdoer and the protection of society are among the factors a court may

consider when sentencing). Thus, contrary to defendant's contention, the trial court did consider his expressions of remorse offered at the 2019 resentencing; it simply did not weigh them to defendant's satisfaction. Defendant has not pointed to any error in the court's reasoning. As in the case of his learning disability, although defendant implies that the court inadequately weighed this factor, he offers no basis for this implication, nor argument regarding the weight the court should have given the factor. Considering the conclusory nature of defendant's argument and his failure to cite any authority for his position, defendant has given this Court no reason to grant him resentencing relief. See *People v Payne*, 285 Mich App 181, 195; 744 NW2d 714 (2009).

## 4. YOUTH

Defendant urges this Court to adopt the "transitional legal category" of "young adulthood" for individuals aged 18 to 21 years of age in recognition of a growing body of research showing that the human brain is not fully developed until age 25. Defendant contends that, in *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), the United States Supreme Court arbitrarily selected 18 as the age beyond which juvenile offenders may be sentenced as adults, even though the Court cited "to research and amici that acknowledge[d] the brain continues to grow into an individual's twenties."

As defendant points out, the United States Supreme Court held in *Miller* that mandatory life imprisonment without parole for offenders under the age of 18 when they committed their crimes violates the United States Constitution's prohibition on cruel and unusual punishments. *Miller*, 567 US at 479. Although given the opportunity to do so, the Michigan Supreme Court recently declined to consider whether *Miller* should be extended to 18 year old offenders. *People v Manning*, __ Mich __; 951 NW2d 905 (2020) (Docket No. 160034). In addition, this Court has declined to extend *Miller* to crimes other than those carrying nonparolable life sentences. *People v Williams*, 326 Mich App 514, 521; 928 NW2d 319 (2018) (noting "defendant's sentence of life with the possibility of parole satisfied *Miller's* mandate") rev'd on other grounds ___ Mich ___; 940 NW2d 75 (2020).[5] A defendant's age, emotional maturity, and other factors can certainly be considered when dispensing an individualized sentence. Beyond that, binding precedent does not allow us to require trial courts to extend *Miller* beyond the parameters set by the United States Supreme Court and the Michigan Supreme Court.

Lastly, in his supplemental brief, defendant asserts that the court's discussion of his youth, learning disability, and remorse, "previously unweighted factors," effectively transformed the

---

[5] In *People v Wines*, 323 Mich App 343, 352; 916 NW2d 855 (2018), rev'd in nonrelevant part 950 NW2d 252 (Mich, 2020), this Court held that, when sentencing minor offenders convicted of first-degree murder facing a parolable life sentence, "the court should be guided by a balancing of the [*People v*] *Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972)] objectives and in that context is required to take into account the attributes of youth, such as those described in *Miller*." Opinions differ regarding whether *Wines* extends *Miller*, or "stands for the unremarkable principle that traditional penological goals should guide a trial court's sentencing discretion and that the age of a particular defendant may affect the analysis of those traditional penological goals" Wines, 950 NW2d at 255 (CLEMENT J., concurring).

hearing on defendant's 2020 motion for another resentencing into a full resentencing, at which he had a right to be present.

This Court has rejected similar arguments to reclassify motions for resentencing as sentencing hearings. In *People v Mouat*, 194 Mich App 482, 487; 487 NW2d 494 (1991), the defendant argued that the trial court had actually resentenced him at the hearing on his motion for resentencing without his being present. This Court observed that, "in its opinion regarding defendant's motion for resentencing and to correct judgment of sentence, the trial court merely noted that it had not previously articulated its reasons for defendant's sentences and proceeded to do so." *Mouat*, 194 Mich App at 487. The Court concluded that this did not constitute a resentencing, and that the defendant was not entitled to resentencing. *Id*.

With respect to rehabilitation and defendant's disability and remorse, this case is similar to *Mouat*, as the trial court merely articulated its reasons for decisions it had already made. Defendant contends that the trial court had not previously considered these factors. However, the trial court indicated that it *had* heard and considered defendant's learning disability at both the 2011 initial sentencing hearing and the 2019 resentencing hearing, and it considered defendant's remorse at the 2020 resentencing motion. As to adoption of a "young adulthood" category, defendant first broached this possibility in his motion for another resentencing. The trial court correctly concluded that the current state of the law precluded adoption of defendant's argument; the court's discussion of defendant's age as a mitigating factor did not extend beyond the trial court's observing that *Miller* was inapplicable. Here, as in *Mouat*, the trial court simply articulated its reasons for its sentencing decision and its denial of defendant's motion for resentencing. See *Mouat*, 194 Mich App at 487. Under the circumstances presented here, the trial court's explanation for why it was denying defendant's motion for another resentencing did not effectively transform defendant's motion into an actual resentencing.

For the reasons stated above, the trial court did not abuse its discretion by denying defendant's motion for resentencing and defendant has given this Court no reason to remand this matter for another resentencing.

Having concluded that the trial court did not commit a scoring error, or abuse its discretion in handling defendant's claim of inaccurate information or in denying his motion for another resentencing, we affirm defendant's sentence.

Affirmed.

/s/ Jane M. Beckering
/s/ David H. Sawyer
/s/ Douglas B. Shapiro